UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Philander Jenkins,

           Plaintiff,

v.

County of Hennepin, Minnesota;
City of Minneapolis, Minnesota;
Officer Jeffrey Jindra, in his official
and individual capacities; and
Margaret Pedersen, in her official
and individual capacities,

           Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 05-979 ADM/JSM

---

Jill Clark, Esq., Jill Clark P.A., Golden Valley, MN, and Jill M. Waite, Esq., Waite Law Office, Minneapolis, MN, argued on behalf of Plaintiff.

Toni A. Beitz, Esq., Hennepin County Attorney's Office, Minneapolis, MN, argued on behalf of the County of Hennepin and Margaret Pedersen; James Anthony Moore, Esq., Minneapolis City Attorney, on behalf of the City of Minneapolis.

---

## I. INTRODUCTION

On February 16, 2007, oral argument before the undersigned United States District Judge was heard on Defendants County of Hennepin ("Hennepin County") and Margaret Pedersen's ("Pedersen") (collectively, the "County Defendants") Motion for Summary Judgment [Docket No. 53]. Also before the Court is Defendant City of Minneapolis's ("the City") Motion for Summary Judgment [Docket No. 97]. In his Amended Complaint [Docket No. 20], Plaintiff Philander Jenkins ("Jenkins") asserts claims for violations of 42 U.S.C. § 1983, and for assault and battery. For the reasons set forth below, the County Defendants' Motion is granted and the City's Motion is granted regarding Count I of Jenkins' Amended Complaint.

## II. BACKGROUND

In the early afternoon of May 21, 2003, officers of the Minneapolis Police Department executed a search warrant for controlled substances at a residence in North Minneapolis where Jenkins was present.  County Defs.' Mem. in Supp. of Mot. for Summ. J. [Docket No. 92] at 1.  Jenkins alleges while he was in handcuffs police officer Jeffrey Jindra ("Jindra") kicked him in the head.  Jenkins Aff. [Docket No. 105] ¶ 3.  After finding contraband, including cocaine, the officers arrested Jenkins and transported him to the Hennepin County Adult Detention Center ("ADC").  County Defs.' Mem. in Supp. of Mot. for Summ. J. at 2.[1]

At approximately 1:50 p.m., during ADC's routine admission process, Detention Deputy Patricia Graves ("Graves") interviewed Jenkins in the sally port in the presence of a police officer.  Beitz Aff. [Docket No. 95] Ex. G-1; Graves Dep. (Clark Aff. [Docket No. 106] Ex. A) at 20.  Because Jenkins claimed he had been injured in the preceding 24 hours, Graves referred Jenkins to the intake nurse on duty.  Beitz Aff. Ex. G-1.  Graves recorded that Jenkins did not have an obvious need for medical attention.  Id.  During the next few hours, staff at the ADC completed administrative functions regarding Jenkins' detainment, including a booking photograph.  Graves Dep. at 35-38.

At approximately 5:00 p.m., Stephanie Hinds Horobin ("Hinds Horobin"),[2] the intake nurse on duty, assessed Jenkins.  Beitz Aff. Ex. G-2.  In a list of preprinted categories, Hinds Horobin recorded that Jenkins was alert and oriented, cooperative, demonstrated appropriate behavior, Jenkins' skin was warm and dry, Jenkins' gait was steady, and that he did not have tremors, shortness of breath or wheezing, or abnormal speech.  Id.  Hinds Horobin also recorded

---

[1] Jenkins pled guilty to felony possession of cocaine in December 2003.

[2] Stephanie Hinds Horobin was then known as Stephanie Hinds.

Jenkins' claim that "I was hit by the police—in the head and in my jaw." Id. She also noted her observations that Jenkins had a bump on the left side of his forehead, that there was an abrasion over the bump, that Jenkins had an active range of motion in his jaw, and that there was no swelling in Jenkins' jaw. Id.; Hinds Horobin Dep. (Clark Aff. Ex. D) at 39. Jenkins, however, claims his jaw was obviously swollen, and that his speech and the range of motion in his jaw were affected. Jenkins Aff. ¶¶ 5-6.

Based on her observations, Hinds Horobin decided not to physically examine Jenkins' jaw. Hinds Horobin Dep. at 43. Hinds Horobin also recorded on Jenkins' medical chart that she gave him ibuprofen, advised him regarding the use of over-the-counter medications, and informed Jenkins he should call the ADC nurseline if he experienced increased, changed, new, or persisting signs and symptoms. Id. at 39; Beitz Aff. Ex. G-2. Hinds Horobin noted that Jenkins "verbalized understanding [and] agrees with plan." Beitz Aff. Ex. G-2; Hinds Horobin Dep. at 39. Jenkins now alleges that he did not receive ibuprofen from Hinds Horobin and that he never agreed with Hinds Horobin's plan that he should call the nurseline if his symptoms persisted. Jenkins Aff. ¶ 8.

The ADC nurseline was staffed daily by a nurse from 1:00-2:00 p.m. and from 6:00-7:00 p.m. Beitz Aff. Ex. R-1. Detainees used phones in their housing units to call the nurseline. Nurses were required to document calls by recording a detainee's name in the nurseline log, and by making a note of the call on the detainee's medical chart. Id.; Pedersen Dep. (Beitz Aff. Ex. N; 2d Beitz Aff. [Docket No. 110] Ex. X; Clark Aff. Ex. R) at 39-40. Detainees with acute medical needs could contact an ADC deputy by pressing an emergency call button located in each cell. Pedersen Dep. at 125.

Jenkins testified that he spoke with a nurse during every nurseline shift from the evening of May 21, 2003 through the evening of May 27. Jenkins Dep. at 59-60, 64-65, 81, 85-88, 89. Jenkins avers he complained that he was experiencing pain from being kicked by the police, he needed medication, and he needed to see a doctor. Id. at 59. Jenkins also claims he complained to various nurses during evening rounds when nurses dispensed medication to inmates, and to various deputies at the ADC.[3] Id. at 86, 91. Except for the occasions noted below, Jenkins claims all of these individuals failed to take any action beyond providing him with over-the-counter medications delivered during evening medication rounds. Id. at 63.

In contrast to Jenkins' testimony, ADC nurseline records and Jenkins' medical chart show only one instance of Jenkins calling the nurseline in May 2003. Beitz Aff. Exs. G-3, J. These records show that on May 26 at about 1:45 p.m., licensed registered nurse Mary Brain ("Brain") answered Jenkins' call. Id. Exs. G-3, J. Brain noted on Jenkins' medical chart that Jenkins complained he was kicked by police, his jaw "was already hurt and it made it worse," he could not open his jaw, and Motrin was no help. Id. Ex. G-3. Brain placed Jenkins on a list to be seen the next morning by a nurse during "treatments." Brain Dep. (Clark Aff. Ex. C) at 45, 48. Brain did not send Jenkins for immediate medical care because she did not believe the situation was urgent, since Jenkins had been in custody for five days since his initial complaint. Id. at 51-52.

---

[3] Jenkins further claims in an affidavit that he filed medical grievances in the form of "green slips." Jenkins Aff. ¶ 15. However, during his deposition Jenkins testified that he did not file any grievances or green slips in May 2003, and the ADC has no record of Jenkins filing a green slip. Jenkins Dep. at 226; 2d Larson Aff. [Docket No. 111] ¶¶ 8-9. Since Jenkins' affidavit contradicts his deposition testimony, and Jenkins has not attempted to explain the inconsistency, his claim that he filed green slips can not be credited. See Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1363-66 (8th Cir. 1983).

On May 27, 2003, Jenkins was seen at "treatments" by Carolyn Martin ("Martin"), a licensed practical nurse. Beitz Aff. Ex. G-3. Martin noted on Jenkins's medical chart his complaints of jaw pain and an inability to blow his nose or chew. Id.; Martin Dep. (Beitz Aff. Ex. M; 2d Beitz Aff. Ex. U; Clark Aff. Ex. F) at 59. Martin recorded her observations that Jenkins's lower left jaw was swollen and that he could not fully open his mouth. Beitz Aff. Ex. G-3; Martin Dep. at 64. Martin informed Jenkins that he would be seen by a doctor at sick call the next morning. Beitz Aff. Ex. G-3; Martin Dep. at 75; Jenkins Dep. at 96.

At approximately 1:20 p.m. on May 27, 2003, Martin called Pedersen, a licensed registered nurse who supervised the ADC nursing staff, to discuss Jenkins's condition. Beitz Aff. Ex. G-2. After this conversation, Martin documented a new plan—Jenkins would be seen at the Hennepin County Medical Center ("HCMC") within a day or two for an x-ray. Beitz Aff. Ex. G-3. Pedersen also documented the conversation with Martin. Beitz Aff. Ex. G-2. Pedersen avers she did not send Jenkins for an immediate x-ray because Martin "did not communicate that this was an urgent need." Pedersen Dep. at 80. Though somewhat unclear, Martin's testimony suggests she recommended that Jenkins receive an immediate x-ray, but Pedersen overrode this recommendation. Martin Dep. at 238-41.

On the morning of May 28, 2003, Jenkins was taken to HCMC. HCMC records show Jenkins informed the examining nurse that his pain was 5 on a scale of 10, and that ibuprofen had given him "mild relief." Beitz Aff. Ex. H-1. Based on x-ray and CT scans, a radiologist determined that "[t]here is a fracture line transversely through the left lower body of the mandible just superior to the mandible angle with minimal displacement. There is no obvious displacement." Id. Ex. H-2. HCMC Resident Physician Dr. Mark Cardamone-Rayner examined

5

Jenkins and performed open reduction and internal fixation surgery under Staff Physician Dr. Rick Odland's ("Odland") supervision.  Id. H-5.  The operation report indicates that Jenkins did not report any facial numbness prior to the surgery.  Id. Ex. H-5.  After the surgery, Jenkins returned to the ADC and was housed in the ADC's medical unit until his conditional release on May 30.  Larson Aff. ¶ 3.  Since his surgery, Jenkins has complained of numbness in his left lower lip and tooth, and that his teeth are not aligned.  Beitz Aff. Ex. I.

On May 20, 2005, Jenkins filed the instant lawsuit.  In his Amended Complaint, filed March 22, 2006, Jenkins asserts claims under 42 U.S.C. § 1983 against the City, Hennepin County, Margaret Pedersen, and Jindra.  Jenkins also asserts a claim for assault against Jindra and the City, and for Battery against Jindra.

### III. DISCUSSION

**A.     Summary Judgment Standard; the City's Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957

(8th Cir. 1995).

Jenkins does not oppose dismissal of his § 1983 claims against the City. See Feb. 8, 2007 Letter [Docket No. 113]. Therefore, the City's Motion for Summary Judgment is granted as to Count I of the Amended Complaint. Jenkins's Amended Complaint also asserts a state law assault claim against the City. Since the City's Memorandum [Docket No. 99] in support of its Motion does not address Jenkins's assault claim, the City's Motion for Summary Judgment is denied as to Count II of the Amended Complaint.

**B.       The County Defendants' Motion for Summary Judgment**

Jenkins sues the County Defendants under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

Jenkins claims that the medical care provided to him by the County Defendants was so inadequate that it violated his right to due process under the Fourteenth Amendment of the United States Constitution.[4] Although Jenkins was a pretrial detainee when the County Defendants allegedly violated his constitutional rights, Eighth Circuit precedent establishes Jenkins's claim is to be analyzed as a convicted prisoner's claim under the Eighth Amendment standard of whether inadequate medical care constitutes cruel and unusual punishment. See Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006).

**1.       § 1983 Claims against Margaret Pedersen in Her Individual Capacity**

To prevail on his claims against Pedersen in her individual capacity, Jenkins must show

---

[4] Jenkins has waived all other § 1983 claims asserted against the County Defendants in the Amended Complaint. Mem. in Opp'n to Mot. for Summ. J. [Docket No. 103] at 29.

that she committed "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). This standard contains both an objective and a subjective component: a plaintiff must show both (1) that he suffered from objectively serious medical needs, and (2) that prison officials actually knew of but deliberately disregarded those needs. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (citation omitted).

        a.     **Serious Medical Need**

"A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997). Where, as here, a plaintiff alleges that a delay in treatment violated his constitutional rights, "the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997). A plaintiff must present "verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." Coleman, 114 F.3d at 784.

It is undisputed Jenkins's fractured jaw had not been diagnosed by a physician when he arrived at the ADC on May 21. Therefore, to survive summary judgment Jenkins must present sufficient evidence that his need for medical treatment was so obvious that a layperson would recognize that a doctor's attention was necessary. The County Defendants argue that the earliest date Jenkins can show such an obvious need is May 27, 2003, when Martin examined him. County Defs.' Mem. in Supp. of Mot. for Summ. J. at 9. The County Defendants further argue that although it was obvious on May 27 that Jenkins needed a doctor's care, it was not obvious to

Martin, Pedersen, or a layperson that Jenkins needed to see a doctor immediately.  Further, the County Defendants contend that Jenkins has not presented adequate verifying medical evidence that the delay from May 27 to May 28 was detrimental to the treatment of Jenkins's jaw injury.  For these reasons, the County Defendants argue that Jenkins can not make the objective showing necessary to prevail on his § 1983 claim.

In response, Jenkins argues summary judgment should be denied because he has presented sufficient evidence that by May 21, 2003 it was obvious he should see a doctor immediately.  Jenkins further argues that he has presented sufficient verifying medical evidence that the delay in his treatment from May 21 to May 28 caused him unnecessary pain and may have led to nerve damage resulting in the numbness he experiences in his left lip area.  See Hamlar Dep. (Beitz Aff. Ex. P; Clark Aff. Ex. S) at 40-41, 69.

Because Jenkins can not establish that Pedersen was deliberately indifferent, or that Hennepin County had a policy or custom that caused the alleged violations of Jenkins's constitutional rights, it is unnecessary to analyze whether Jenkins can satisfy the objective component of his § 1983 claim.  For the purposes of the County Defendants' Summary Judgment Motion, the Court assumes that Jenkins could demonstrate at trial that he had a serious medical need, and that delay could have led to detrimental consequences.

      **b.**     **Deliberate Indifference**

To prevail on his § 1983 claim against Pedersen in her individual capacity, Jenkins must show that Pedersen knew of but deliberately disregarded his serious medical needs.  Jolly, 205 F.3d at 1096.  "Deliberate indifference is akin to criminal recklessness."  Drake v. Koss, 445 F.3d 1038, 1042 (8th Cir. 2006).  "The prisoner must show more than negligence, more even

than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995). Jenkins argues Pedersen is individually liable for her own conduct on May 27, 2003, and for her conduct as the supervisor of ADC nurses.

### i. Pedersen's Conduct on May 27, 2003

Jenkins argues that, at a minimum, he has sufficient evidence that Pedersen's conduct on May 27, 2003 showed deliberate indifference to his serious medical needs. Jenkins contends Pedersen's deliberate indifference is shown by: (1) her failure to immediately send Jenkins for an x-ray, (2) her failure to personally examine Jenkins, (3) her failure to provide Jenkins with stronger pain medication, and (4) her failure to ensure that Jenkins was warned regarding the risks of chewing food or sleeping on his back. See Mem. in Opp'n to County Defs.' Mot. for Summ. J. at 35-40.

The record shows that Pedersen first became aware of Jenkins's medical issues on May 27, 2003, when Martin called her to discuss Jenkins's need for an x-ray. At that point, Pedersen knew that: (1) Jenkins complained to intake nurse Hinds Horobin on May 21 that the police hit his jaw, (2) Jenkins complained to Martin that his jaw was hurting and that he was unable to chew or blow his nose, and (3) Martin observed that Jenkins's jaw area was swollen and had limited range of motion. Beitz Aff. Ex. G-2. Martin's and Pedersen's testimony conflict as to whether Martin conveyed a sense of urgency regarding Jenkins's need for an x-ray. Compare Pedersen Dep. at 80 with Martin Dep. at 238-41. Regardless, Pedersen believed Jenkins's situation did not require immediate x-rays because "the problem had been persisting for . . . approximately a week, there were no indications of severe malformation, there were no

indications that he was unable to get enough sustenance, there were no indications that a delay of a day would . . . cause an ongoing problem." Pedersen Dep. at 82.

The Court finds that the evidence in the record is insufficient to support a finding that Pedersen's conduct on May 27, 2003 was "akin to criminal recklessness." Drake, 445 F.3d at 1042. Based on the information available to her, Pedersen could have reasonably believed that Jenkins's condition required an x-ray but was not an emergency necessitating immediate attention. Further, since Pedersen had authorized an x-ray based on Martin's personal evaluation of Jenkins, Pedersen's failure to personally examine Jenkins on May 27 is not support for a finding of deliberate indifference. Similarly, there is no evidence in the record that Pedersen was told Jenkins was experiencing extreme pain; therefore, her failure to provide him with stronger pain medication can not constitute deliberate indifference. Finally, any failure to warn Jenkins to take precautions such as chewing soft food would not exceed mere negligence. See Estate of Rosenberg, 56 F.3d at 37 (stating that "[t]he prisoner must show more than negligence"). Jenkins can not prevail on his § 1983 claim to the extent it is premised on Pedersen's conduct on May 27, 2003.

### ii.     Pedersen's Supervisory Liability

Jenkins seems to argue that Pedersen is liable in her supervisory role for all the alleged deficiencies in his treatment that occurred from his arrival at the ADC on May 21, 2003 until Martin consulted with Pedersen on May 27. A supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993). "The supervisor must know about the conduct

and facilitate it, approve it, condone it, or turn a blind eye [to it]." Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995) (quotation omitted).

Jenkins argues Pedersen is individually liable for the following deficiencies that occurred from May 21-27, 2003: (1) nurses ignored his repeated requests for medical care, (2) nurses failed to schedule him for an x-ray, (3) nurses should have prescribed stronger medication to alleviate his pain, and (4) intake nurse Hinds Horobin and other nurses failed to examine him. Assuming arguendo that all these facts are true, Jenkins's claims against Pedersen in her supervisory role fail because Jenkins presents no evidence that Pedersen knew or should have known that nurses at the ADC were ignoring patients' serious medical needs. Jenkins relies on Martin's testimony that she believed there were problems with the nurseline, and that inmates sometimes complained to her that their medical needs were not being timely addressed. Martin Dep. at 254, 263-64. However, except for a discussion regarding nurseline access problems experienced by inmates who, unlike Jenkins, were segregated from the general jail population, there is no evidence that Martin raised any of these concerns with Pedersen. See id. at 262-63.

Jenkins's § 1983 claims against Pedersen in her individual capacity do not survive summary judgment.

### 2.     § 1983 Claims against Hennepin County

Jenkins also asserts § 1983 claims against Pedersen in her official capacity and against Hennepin County. Jenkins's suit against Pedersen in her official capacity "is merely a suit against the public employer," which is Hennepin County. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). The Supreme Court in Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 694 (1978), held that local governments are not

liable under § 1983 for injuries inflicted solely by their employees or agents. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id.

The Eighth Circuit "does not use the terms 'policy' and 'custom' interchangeably when conducting a Monell analysis. Rather, a 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999). To establish the existence of a municipal custom, a plaintiff must satisfy three requirements:

1. The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2. Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct;

3. The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

Id. (citation omitted).

Without distinguishing between policies and customs, Jenkins identifies seven "policies or customs" as unconstitutional. Jenkins first identifies two policies or customs regarding the initial screening in the sally port: (1) medically untrained deputies conduct initial screening in the sally port with insufficient guidelines regarding when to call a nurse; and (2) unless called to the sally port, an intake nurse does not see a detainee until after he has been booked. These alleged deficiencies can not support a Monell claim because no reasonable jury could find that they were the moving force behind the constitutional violations Jenkins alleges. When Jenkins

saw intake nurse Hinds Horobin a few hours after the sally port screening, she told him to take aspirin and call the nurseline if his symptoms persisted. There is no basis to believe Hinds Horobin's instructions would have been different had she been present in the sally port when Jenkins first arrived at the ADC. Thus, Jenkins can not demonstrate that the absence of an intake nurse in the sally port was the moving force behind any delay in medical care alleged to be unconstitutional.

Jenkins next argues that the ADC has a policy or custom whereby intake nurses do not physically examine incoming detainees. Jenkins concedes that a written policy in place at the ADC provided that medical intake screening is not limited to visual observations. Mem. in Opp'n to Mot. for Summ. J. at 7; see Larson Aff. Ex. D-6. Therefore, the record must contain sufficient evidence to establish the existence of a custom that intake nurses do not examine incoming detainees. The only evidence Jenkins cites to support the existence of such a custom is Martin's testimony that Hinds Horobin stated she refused to touch detainees, and Hinds Horobin's testimony that she did not perform a hands-on evaluation of Jenkins because she did not observe swelling, limited range of motion, or abnormal speech. Martin Dep. at 272-75; Hinds Horobin Dep. at 39, 44-45. This evidence is insufficient for a reasonable jury to find the existence of a "widespread, persistent pattern of unconstitutional misconduct" by ADC nurses, or that Pedersen or any other policymaker at the ADC approved or tacitly authorized such conduct.[5]

Jenkins next identifies a policy or custom of delaying access to over-the-counter

---

[5] The County Defendants argue that under state law, Hennepin County's Board or the ADC's Sheriff are the only relevant policymakers for the ADC. See Reply Mem. in Supp. of Mot. for Summ. J. [Docket No. 108] at 19. However, Pedersen co-signed a number of policies that governed the conduct of nurses at the ADC. See Larson Aff. Exs. D-1 to D-11. Thus, Pedersen's acts and edicts are considered here as official policy.

medications for 24-48 hours after an inmate is booked, and of intake nurses not providing narcotics for pain. Jenkins fails to cite any evidence of an official ADC policy that resulted in a 24-48 hour delay in providing an inmate with over-the-counter pain medication. Therefore, Jenkins must establish the existence of a custom. The facts are disputed on whether Jenkins received aspirin from Hinds Horobin on May 21, 2003; nonetheless, this single, isolated incident is insufficient to support the existence of a custom. See McGautha v. Jackson County, 36 F.3d 53, 57 (8th Cir. 1994) (stating that "[l]iability for an unconstitutional custom or usage . . . cannot arise from a single act"). In response to the allegation of Hinds Horobin's failure to dispense narcotics to Jenkins on May 21, the County Defendants emphasize that state and federal law require a physician's authorization before narcotics can be provided to an inmate. Therefore, Hinds Horobin's failure to prescribe narcotics on May 21 is not the result of a policy or custom that violates the Constitution.

Jenkins next argues the nurseline was representative of a policy or custom of delaying or ignoring detainees' requests for medical care. Jenkins cites no official policy that resulted in institutionalized delay through use of the nurseline. Moreover, the County Defendants have produced evidence that nurses on the nurseline had discretion to put a detainee on a treatment list for assessment by a nurse, place a detainee on sick call to be seen by a doctor the next day, or immediately assess the detainee in person. See Beitz Aff. Ex. R-1. Therefore, Jenkins must present sufficient evidence to establish the existence of a custom whereby inmates' serious medical needs were ignored or delayed through use of the nurseline. To establish such a custom, Jenkins relies on Martin's testimony that certain nurses had their own practices that would effectively "put off" a detainee, and that, when she did medication rounds, it was common for an

inmate to complain that his medical needs were not being adequately addressed. Martin Dep. at 254, 260, 264. However, Martin's vague testimony is insufficient for a reasonable jury to find the existence of a widespread, persistent pattern of unconstitutional misconduct whereby ADC employees routinely ignored inmates' serious medical needs. Moreover, there is no evidence that Pedersen or other policymakers at the ADC were aware that nurses routinely ignored or delayed treatment of inmates' serious medical needs.

Jenkins next argues that the ADC had a policy or custom whereby nurses lacked discretion to send detainees for necessary urgent medical treatment. It is alleged Pedersen frequently overrode a nurse's order for emergency care or diagnostics. However, Jenkins cites no written policy that subordinate nurses' recommendations for emergency care should routinely be overridden. Therefore, he must establish the existence of a custom. Although there is a factual dispute as to whether Martin recommended an immediate x-ray on May 27, 2003, and whether Pedersen countermanded this direction, this isolated incident is insufficient to establish the existence of a custom whereby subordinate nurses were routinely overridden if they informed a supervisor that a detainee urgently needed medical diagnostics.[6]

Finally, Jenkins relies on an undated ADC document stating that "[m]any inmates have medical needs that can safely be deferred until it is determined that they will remain at the ADC after their initial court appearance." Clark Aff. Ex. G-8. The document further explains that to preserve ADC resources, nurses should schedule an inmate's follow up appointment for the day after the inmate's scheduled court date so long as medical intervention can be deferred. Id.

---

[6] Jenkins also argues that on May 26, 2003 Brain wanted to schedule him for a doctor's appointment but Pedersen vetoed it. See Mem. in Opp'n to Mot. for Summ. J. at 46. However, neither Brain's testimony nor Pedersen's testimony supports this argument.

Jenkins contends that this policy heavily contributed to the delay that occurred before he received an x-ray. However, Jenkins was taken to the HCMC two days before his May 30, 2003 court appearance on the drug possession charges, and there is no evidence that the ADC's deferral policy (assuming it was an official policy) caused Hinds Horobin, Brain, Martin, Pedersen, or any other individuals associated with Jenkins's medical care at the ADC to delay sending Jenkins for an x-ray.

Jenkins lacks sufficient evidence to establish that Hennepin County policies or customs caused any constitutional violations. Therefore, summary judgment is granted to Hennepin County and Margaret Pedersen in her official capacity.

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants Margaret Pedersen and the County of Hennepin's Motion for Summary Judgment [Docket No. 53] is **GRANTED**;

2. Defendant the City of Minneapolis's Motion for Summary Judgment [Docket No. 97] is **GRANTED IN PART AND DENIED IN PART**.

BY THE COURT:

s/Ann D. Montgomery

ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: May 30, 2007